IN THE UNITED STATES DISTRICT FOR THE
SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | |
|---|---|
| **HUBERT VAZ-NAYAK and CHILDRENS LIGHTHOUSE OF SPRING**, <br>    *Plaintiffs*, <br><br> v. <br><br> **COUNTY OF MONTGOMERY, TEXAS, JASON MARTINEZ, and SCOTT FURCHES,** <br>    *Defendants* | § § § § § § § § § § § § § <br><br> NO. 4:18-CV-1482 |

### PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Hubert Vaz-Nayak and Childrens Lighthouse of Spring file their original complaint complaining of The County of Montgomery, Texas, and its Precinct 3 Constable Ryan Gable's Office employees Sergeant Jason Martinez, and Scott Furches.

### I. Parties

1.  Plaintiff Hubert Vaz-Nayak ("Vaz-Nayak") is a natural person operating a business at 2885 Waterbend Cove, Spring, Texas.

2.  Plaintiff Childrens Lighthouse of Spring ("the "School") is one of 45 independently owned franchises of the private early school system known as "Childrens Lighthouse," which is located in 12 cities across the United States. Childrens Lighthouse of Spring is located at 2885 Waterbend Cove, Spring, Texas.

3.  Defendant Montgomery County ("MOCO") is a political subdivision of the state Texas, who may be served by serving Honorable Craig Doyal,

Montgomery County Judge, at his place of employment at 501 North Thompson, Suite 401, Conroe, Texas 77301, or wherever he may be found.

4. Defendant Jason Martinez is a natural person who may be served with process at his place of employment, Montgomery County Precinct 3 Constable Ryan Gable's Office, 1520 Lake Front Circle, Suite 200, The Woodlands, Texas 77380, or wherever he may be found.

5. Defendant Scott Furches is a natural person who may be served with process at his place of employment, Montgomery County Precinct 3 Constable Ryan Gable's Office, 1520 Lake Front Circle, Suite 200, The Woodlands, Texas 77380, or wherever he may be found.

## II.  Jurisdiction & Venue

6. The Court has jurisdiction over this suit under 28 U.S.C. § 1331 because plaintiffs' claims arise under the Constitution of the United States.  U.S. Const. art 3, § 2; *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006).  The Court has personal jurisdiction over defendants because they are a political subdivision of the State of Texas located in the Southern District and individual agents or employees thereof.

7. Venue is proper in the Southern District of Texas because defendants reside in the Southern District of Texas and the acts and omissions complained of took place in the Southern District of Texas.

**III. Facts**

8. Childrens Lighthouse is a family-owned early school system with over 45 individually-owned franchised locations in 12 cities nationwide. The School is one of those 45 locations and is owned by Vaz-Nayak and his business partner, Savio Saldanha—both educated, respected, highly successful, brown-skinned Americans of Indian descent. The School has an enrollment of about 200 children.

9. On March 22, 2017, the School terminated employee Gregory James Diglin on the spot for handling a child roughly at approximately 3:12 PM the same day—a fact determined by viewing video of the event captured by the School's onsite surveillance camera. Termination of Diglin's employment occurred *before* the MOCO Precinct 3 Constable's Office was notified of it the following day.[1]

10. On March 23, 2017, Vaz-Nayak learned that officers from MOCO Precinct 3 Constable Ryan Gable's Office were at the School seeking to obtain a copy of the surveillance video from the previous evening. The officers met with School director Sandy Burns, who immediately cooperated by showing them the video. However, concerned about the privacy and security of other small children whose faces were revealed on the video, Burns advised officers the School would need a subpoena or a warrant in order to provide MOCO officers a copy of the video. Officers were initially satisfied with this response and said they would arrange such a subpoena. Unfortunately, what began as a request for voluntary

cooperation then abruptly escalated into an illegal arrest and a warrantless seizure of persons and property.

11.     As the surveillance video shows, when Vaz-Nayak arrived at the school, a MOCO officer showed Vaz-Nayak her badge and asked for a copy of the video. Vaz-Nayak again advised he would gladly arrange to turn over the video upon receipt of "appropriate legal documentation."[2] He also explained the School did not operate the video monitoring technology[3] and lacked the technical expertise to extract a copy of the video MOCO requested. Burns then informed the officer, "We have it recorded and she [officer Jessica Epperson] has to have a subpoena to get that." The video was on a two-hour loop that could be viewed by the parents and was housed on premises. Both Burns and Vaz-Nayak repeated that they lacked the technical expertise to transfer the recording to a memory device and would need to engage the third-party vendor to do this.

12.     Within two minutes of Vaz-Nayak's arrival, MOCO Precinct 3 Constable Ryan Gable's Detective Jason Martinez walked into the School, and without identifying himself, told Vaz-Nayak that Martinez was "losing his patience," and that the DVR had evidence of a crime and he was there to take it.

---

[1]     The warrant for Diglin's arrest was supported by the affidavit of Detective Jessica Epperson, who avers she was informed of the March 22, 2017, event on March 23, 2017.

[2]     As noted above, Vaz-Nayak's legitimate concern in making this request—not that it was legally required to justify his request for a warrant—was protecting the School from potential liability as a result of releasing surveillance recordings of a potentially sensitive nature without a court order. This was particularly true where the video had the potential to become part of public records, because Vaz-Nayak was operating under parental release restriction not to release images unless subpoenaed.

When Vaz-Nayak asked if Martinez had a warrant, Martinez announced, "*I don't need a warrant*." Martinez instructed the other officer to get a "unit" to the School "right now" and demanded Vaz-Nayak's driver's license. When Vaz-Nayak asked why Martinez was demanding his driver's license, Martinez said, "*Because you are obstructing an investigation*." Vaz-Nayak said MOCO could do its investigation but still needed a warrant. Martinez's demeaner did not change and Vaz-Nayak reminded Martinez he was on private property and said if the constables had no warrant or other authority to be on the premises—or to seize School property—they should leave the premises.

13. As recorded by video, the events that followed took place in full view of the School's staff and several parents of children in the School. At no point in this process had Vaz-Nayak ever threatened the officers (physically or verbally), threatened to destroy the video evidence, or behaved in anything but a courteous, cooperative, and respectful manner. Martinez ordered Vaz-Nayak to turn around and handcuffed him. Thus, *within three minutes* of Vaz-Nayak's arrival on the premises, he was in custody. Martinez again instructed a "unit" be called. Neither before nor after this threat or the ensuing interrogation was Vaz-Nayak ever given *Miranda* warnings.

14. Martinez then began to humiliate and threaten the handcuffed Vaz-Nayak. Martinez removed Vaz-Nayak's wallet from his trousers and took Vaz-

---

[3] The technology is provided to the school by a national vendor called "Peanut Butter and Jelly TV," who provides this service to hundreds of childcare facilities around the country.

Nayak's driver's license. When Vaz-Nayak told Martinez this was not necessary and they needed to just talk, Martinez said he was "*past that now.*" When Burns asked what was going on, Martinez said Vaz-Nayak and Burns were "interfering with an investigation" and repeated that the DVR had evidence on it and he was there to take it with him. Vaz-Nayak and Burns continued trying to explain that the DVR did not have the desired recording on it and that the recording system was operated by a third-party vendor.

15. Burns reiterated to Martinez that the vendor's information had been given to the other officer (Epperson) and told Martinez the Diglin child injury incident had already been reported to appropriate authorities, as required by law. Martinez said he was going to take the DVR with him "today" and that Vaz-Nayak and Burns were both preventing Martinez from doing that. Martinez informed Vaz-Nayak that he was going to have a patrol unit come to the school, and Martinez was going to "contact the MOCO district attorney to see if he would accept "criminal charges" against Vaz-Nayak for obstruction. Vaz-Nayak said he did not know why Martinez was escalating his hostilities. Martinez responded that it was Vaz-Nayak who had escalated the situation by "*telling me to get out of here and that we needed a warrant.*" Vaz-Nayak again advised he would call the third-party vendor, apologized, and stated he was not trying to argue.

16. Martinez handed Vaz-Nayak's drivers' license to officer Epperson and told her to "run it." Vaz-Nayak asked Martinez to remove the handcuffs because they were causing pain. Martinez said he would loosen the handcuffs but

not take the them off—but then took them off anyway and ordered Vaz-Nayak to sit in a chair.  Vaz-Nayak again offered to contact the third-party vendor.  When the "unit" arrived, Martinez stated he was stepping outside to call the D.A.'s office.  The other officer ordered the staff talking with Vaz-Nayak back into their offices. Burns asked why she was being ordered into her office instead of being allowed to do her job. The officer stated it is because of the "investigation" and "what is going on."  Throughout the time the officers were there, the School staff had to ask permission to go about doing their jobs.  Martinez told Burns that since she had not given him a copy of the video—the one Burns had already explained the School was not able to extract without assistance from the third-party vendor—she, too, was "impeding" his investigation.  Burns disputed Martinez's declaration that "asking for a warrant" to seize property constituted "impeding" Martinez's investigation.  Burns also told Martinez that the episode with Vaz-Nayak had been captured on video.  Martinez seemed anxious to obtain a copy of the video of his handcuffing Vaz-Nayak—which was later turned over on a USB memory stick provided by Martinez, and also e-mailed to Martinez by the third-party vendor.  Martinez then informed Vaz-Nayak that since—*after* being placed in handcuffs, accused of "impeding" an investigation, threatened with prosecution, and manhandled in full view of his employees and clients—he had *finally* "cooperated," he would not taken to jail and criminally prosecuted, after all.  Martinez apologized to Burns for the way he had spoken to her, but offered no apology to Vaz-Nayak.

17. Vaz-Nayak told the officer he was "not an idiot"—that he knew MOCO needed a warrant. Vaz-Nayak promised to provide MOCO a copy of the video. Officers reminded Vaz-Nayak he was "not allowed to speak to or call anyone." Thirty minutes after Vaz-Nayak first offered to contact the third-party video vendor, MOCO finally allowed Vaz-Nayak to make the call.

18. Burns asked if Vaz-Nayak, who had been confined to the lobby, could be moved to her office. Vaz-Nayak was moved but remained in constant custody of officers. This put Vaz-Nayak out of view of the surveillance cameras. Martinez returned to the building from calling the D.A., spent time with Vaz-Nayak, and then stepped out of Burns' office to check the location of the surveillance camera.

19. Vaz-Nayak then turned on the recording function on his cell phone, but Martinez snatched the cell phone away from Vaz-Nayak—a seizure of Vaz-Nayak's private property—and handed it the other officer, who put it on "airplane mode" and turned off the recording function. Martinez obviously did not want any recordings of what was going to happen next—that way MOCO officers could later make up any version of the events they wanted. Vaz-Nayak would soon learn why.

20. When Furches started to close the door, Vaz-Nayak requested that a witness be allowed into the room. Furches refused to permit this. He then said to Vaz-Nayak, "Do you speak English? Do you understand English? I am going to talk, and you will listen." Furches bent over towards Vaz-Nayak and leaned to

within inches of his face.  He pointed to his name badge and said in a threatening fashion:

> **See my name?  Remember it!  Now that I am here, I'm going to show you the power we have.  I am going to bring the power of the police department and the power of the U.S. government down on you and show you what we can do to you.**

The now-terrified Vaz-Nayak explained to Furches that his preschool was part of the community, too, and he was willing to cooperate.  Vaz-Nayak again explained the necessity of the third-party vendor's providing the video and—although Vaz-Nayak had no obligation to justify his request for a proper warrant—the reason for Vaz-Nayak's request.

21. As MOCO officers departed the School, they chided that while they *could* have obtained a warrant it would have been "easier" if Vaz-Nayak had simply "given it to [them]" *without a warrant* in the first place, as they demanded.  Given the importance of the evidence to criminally prosecuting the School's former employee Gregory James Diglin,[4] it is difficult to understand why MOCO jeopardized the admissibility of the evidence with their warrantless search.  It is equally unfathomable that the officers repeatedly refused to allow Vaz-Nayak to engage the third-party vendor to extract the video and make it available on a memory device.

22. Martinez told Burns that since she had not given him a copy of the video—the one Burns had already explained the School was not able to extract

---

[4] A criminal charge of causing injury to a child in violation of TEX. PENAL CODE § 22.04 was filed against Diglin and is believed to be pending as of the date of this filing.

without assistance from the third-party vendor—she, too, was "impeding" his investigation. Burns disputed that "asking for a warrant" to seize property constituted "impeding" Martinez's investigation. Burns also told Martinez that the episode with Vaz-Nayak had been captured on video. Martinez seemed anxious to obtain a copy of the video of his handcuffing Vaz-Nayak—which was later turned over on a USB memory stick provided by Martinez, and was also e-mailed to Martinez by the third-party vendor. Martinez then informed Vaz-Nayak that since—*after* being placed in handcuffs, accused of "impeding" an investigation, threatened with prosecution, and manhandled in full view of his employees and clients—he had *finally* "cooperated," he would not taken to jail and criminally prosecuted, after all. Martinez apologized to Burns for the way he had spoken to her. Martinez offered no apology to Vaz-Nayak.

23. A few weeks after these incidents, Vaz-Nayak requested an Internal Affairs investigation by Constable Gable's office. Vaz-Nayak listed several topics to be investigated, including—and especially—the violation of his Fourth Amendment rights during the March 23, 2017, arrest and handcuffing. Yet, Constable Gable limited the Internal Affairs investigation to what was self-servingly termed "rude behavior" by the officers. This investigation concluded that the officers were not "rude." Neither the deprivation of Vaz-Nayak's Fourth Amendment rights nor any of Vaz-Nayak's other requests for investigation was ever addressed.

24. As bad as the March 23, 2017, incident was, MOCO was not finished, yet. On March 27, 2017, several officers in official vehicles under the supervision of MOCO Precinct 3 Constable Ryan Gable "swarmed" the school to execute a warrant when Vaz-Nayak's partner, Savio Saldanha was present. Vaz-Nayak was already complying with the subpoena served on March 24, 2017, which he had advised would take a "substantial amount of time." In a conversation with Savio Saldanha, an assistant district attorney allowed Vaz-Nayak a week to complete this process. However, this accommodation would not have allowed Constable Gable to make a dramatic publicity "splash" for political purposes, so he chose to ignore it. Constable Gable's website trumpets his "mission statement" with this:

> **The mission of the Montgomery County Constable's Office, Precinct 3, is to enhance the safety and protect the trust of the citizens of Montgomery Count … with honor and integrity, while conducting ourselves with the highest ethical standards to maintain public confidence.**

*See* https://www.mcco3.org/about/, last visited April 20, 2018. Based on the abuse of plaintiffs that gave rise to this suit, Gable has failed miserably at that.

25. Furthermore, the March 27, 2017, "swarm" incident appears to have been predicated on a warrant obtained with perjured testimony. MOCO Detective Jessica Epperson swore out an "Affidavit for Search Warrant" representing that the father of the child, Brian Wolter, had told Epperson there was a "second camera" in the School room where the incident involving Diglin and the child had occurred. Detective Epperson somewhat ominously testified that neither Burns

nor Vaz-Nayak had "informed [Epperson] that this second camera existed." Therefore, in order to obtain the warrant, Epperson was implying Vaz-Nayak was concealing evidence. There is just one problem with this: there was not—and never had been—a second camera in the room. Mr. Saldanha not only explained that there never had been a second camera, he got the vendor on the phone who confirmed this to the officers. Undeterred, the officers proceeded to execute the warrant. As of this filing, it is not known whether the perjurer was the father of the child (by falsely claiming to Epperson that *there was* a second camera) or Epperson (by falsely claiming the father *told her* there was a second camera).

26. The aggressively hostile defendant Furches—who four days earlier had hissed into Vaz-Nayak's face that Furches would show Vaz-Nayak "the power we have" and "bring the power of the police department and the power of the U.S. government down on you and show you what we can do to you"—was in charge of the March 27, 2018, swarm. Despite this, Vaz-Nayak's staff cooperated willingly. When Burns asked Furches what was sought in the warrant so she could help provide the items requested, he shouted at her so intensely she began to weep. He then shouted, "Turn around!" and—without her permission—started wiping her tears with a paper napkin. Burns was taken aback by Furches' unpermitted touching of Burns in this manner.

27. Lieutenant Furches approached Mr. Saldanha, a senior executive at Halliburton, and without provocation, warned him that the warrant being served— that Furches had not bothered to obtain before seizing Vaz-Nayak's person and

property four days earlier—was a "very powerful document" that allowed the swarming officers to do "a lot of things" at the School. Several eyewitnesses to Furches' behavior were appalled. MOCO Officers seized the School's entire computer and remove it from the school. The publicity and needless drama of the "swarm" caused a massive exodus of families from the School—a loss of business that directly impacted the School and Vaz-Nayak for months. Now 14 months after the "swarm," MOCO has still never returned the School's seized computer.

28. MOCO never filed criminal charges against any School employee except the immediately-terminated Diglin. MOCO never alleged that Vaz-Nayak or the School had concealed or destroyed evidence—except for the misleading insinuations in Epperson's "Affidavit for Search Warrant." MOCO never found any "second camera," or that any "second camera" had ever existed at any time in the past. Vaz-Nayak requested an apology for TXCO's illegal arrest and seizure and proposed that Constable Gable provide additional training in proper investigation procedures to Precinct 3 personnel. Gable refused. On October 7, 2017, Gable proudly announced that Jason Martinez had been promoted to Sergeant.[5]

---

[5] https://www.linkedin.com/in/jason-martinez-1a859a105/, last visited April 20, 2018.

## IV. Plaintiffs' Cause of Action: Deprivation of Fourth Amendment Rights in Violation of 42 U.S.C. § 1983

29. Plaintiffs incorporate Paragraphs 13-28 above as if fully set forth below.

30. One of the most revered of American legal principles known the world over is expressed in the Fourth Amendment to the U.S. Constitution:

> **The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.**

U.S.C.A. CONST. Amend. 4. This is echoed in the Texas Constitution.

> **People shall be secure in their persons, houses, papers, and possessions from all unreasonable searches or seizures.**

TEX. CONST. art I § 9. Every American school child is familiar with this principle, even if he cannot recite the constitutional source of it chapter and verse.

31. Defendants violated Vaz-Nayak's Fourth Amendment right to freedom from unreasonable searches and seizures by detaining him without reasonable suspicion, arresting him without probable cause, and entering his business without a warrant. *See **Carroll v. Ellington***, 800 F.3d 154, 169 (5th Cir. 2015).

> **The ultimate touchstone of the Fourth Amendment is "reasonableness."**

***Brigham City, Utah v. Stuart***, 547 U.S. 398 (2006). It is clearly established that law enforcement may temporarily stop an individual for investigation based on reasonable suspicion that criminal activity is afoot. *See **Terry v. Ohio***, 392 U.S. 1,

27 (1968). Those are obviously not the facts of Vaz-Nayak's uncalled-for seizure in his business premises where he was respectfully cooperating. A person has been "seized" within the meaning of the Fourth Amendment when a reasonable person would believe he was not free to leave. *See* **United States v. Mendenhall**, 466 U.S. 544, 554 (1980). Vaz-Nayak was obviously not "free to leave" when he was handcuffed, ordered to sit in a chair, and Furches was leaning into his face to say, "*Now, I'm are going to show you the power we have.*"

32. Nor is there any legal excuse for MOCO's agents' warrantless invasion and search of Vaz-Nayak's business. Law enforcement may effect a warrantless search based on probable cause. **Hogan v. Cunningham**, 722 F.3d 725, 731 (5th Cir. 2013). It is well-settled that a warrantless entry into a *home* is "presumptively unreasonable." **Stuart**, 547 U.S. at 398. However, the U.S. Supreme Court has also repeatedly "refused to uphold otherwise unreasonable criminal investigative searches merely because *commercial* rather than residential premises were the object of the police intrusions." *See, e.g.*, **See v. City of Seattle**, 387 U.S. 541, 543 (1967), citing **Go-Bart Importing Co. v. United States**, 282 U.S. 344, 357 (1931); **Amos v. United States**, 255 U.S. 313, 316 (1921); and **Silverthorne Lumber Co. v. United States**, 251 U.S. 385, 390 (1920).

33. MOCO representatives have claimed they had "probable cause" to arrest Vaz-Nayak on March 23, 2017, because they had a "reasonable suspicion" that Vaz-Nayak was committing "at least" the crimes of "resisting a search" in

violation of TEX. PEN. CODE § 38.03[6] and "impeding an investigation" in violation of TEX. PEN. CODE § 38.15.[7] Despite defendant Martinez's menacing claims at the time he handcuffed Vaz-Nayak that Martinez could now do "whatever [he] wanted," the video evidence conclusively negates that any "resistance" or "impeding" an investigation ever occurred. Vaz-Nayak's so-called "resistance" and "impediment" consisted solely of his request for a warrant for MOCO's seizure of the School's computers and asking the officers to leave if they did not have one. Requesting a warrant—even "shouting" and "arguing" with officers as to whether they needed a warrant (which did not occur in the case at bar)—does not constitute "interference" with an investigation or "resisting" a search and justifying an otherwise illegal arrest. *See, e.g.,* **Freeman v. Gore**, 483 F.3d 404, 414 (5th Cir. 2007). And MOCO also seems to have forgotten the law that it is a statutory defense to a prosecution under TEX. PEN. CODE § 38.15 that the alleged impediment "consisted of speech only." *Id.*, § 38.15(d).

34. Nor can there be any qualified immunity for defendants under the facts of the case at bar.

---

[6] "A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another by using force against the peace officer or another."

[7] "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with … a person who … is investigating a particular site as part of the person's responsibilities…."

> **To evaluate whether a government official is entitled to qualified immunity, we conduct a two-prong inquiry: we ask (1) whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right, and (2) whether the defendant's conduct was "objectively reasonable in light of clearly established law."**

*Carroll*, 800 F.3d at 169; *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001). It is clearly established law that a warrantless seizure of person who is not resisting arrest, or seizure of property without probable cause to suspect a criminal offense, is a violation of Fourth Amendment rights. *See, e.g.*, *Darden v. City of Fort Worth*, 866 F.3d 698, 706-07 (5th Cir. 2017) (arresting officer not entitled to qualified immunity when suspect was complying with officer's commands and not resisting arrest); *Hanks v. Rogers*, 853 F.3d 738, 746-47 (5th Cir. 2017); *Aguilar v. Robertson*, 513 Fed.Appx. 444, 450 (5th Cir. 2013) (per curiam) ("[T]he law is clear that once the plaintiff stops resisting arrest … the permissible degree of force lessens."). This is a question of law for the Court, not a question of fact for a jury.

### V. Prayer

35. Plaintiffs pray that after a trial on the merits, plaintiffs recover of defendants at least $3,000,000.00 in economic and exemplary damages, the maximum amount of pre-judgment and post-judgment interest on damage awards allowed by law, all costs and attorney's fees in this behalf expended, and such other and further relief, at law or in equity, to which they shall show themselves justly entitled.

Respectfully submitted,

**HANSZEN✦LAPORTE**

By: _____/s/ Jeffrey L. Dorrell_____
**JEFFREY L. DORRELL**
Texas Bar No. 00787386
Federal ID #18465
jdorrell@hanszenlaporte.com
CARL WILSON
State Bar No. 24090472
cwilson@hanszenlaporte.com
14201 Memorial Drive
Houston, Texas 77079
Telephone 713-522-9444
FAX: 713-524-2580
**ATTORNEY IN CHARGE FOR PLAINTIFFS**